HALLIHAN v. THE HANNIBAL & ST. JOSEPH RAILROAD COMPANY, *Appellant.*

Negligence: A CASE OF CONTRIBUTORY NEGLIGENCE ON THE PART OF PLAINTIFF'S INTESTATE DEFEATING RECOVERY. In an action against a railroad company to recover damages for the killing of plaintiff's husband, the evidence showed the circumstances of his death to have been as follows: Deceased was a repairer of cars, of some years experience, in the service of another company, and was familiar with defendant's freight yard, and knew that the work of switching and making up trains was constantly going on there. He also knew the customary mode of doing this work. Defendant had in its yard a repair track, and separate from it, a track known as a transfer track, which was specially set apart for cars whose contents were to be transferred to other roads. On the day of the accident defendant's car repairer was engaged in inspecting a car standing on this transfer track, when deceased happened to pass by. He called to deceased to look at some work that had been done upon the car. Deceased was in the act of complying with this request, and was probably standing or stooping on the track at one end of the car, when another car switched down the track from the opposite direction in the usual manner, struck the first and sent it forward several feet, running over him and inflicting the injuries of which he died. Defendant's car repairer, (who was the only eye-witness,) testified that the accident happened almost the instant he spoke to deceased. The evidence tended strongly to show that there was a brakeman in charge of the colliding car, but that it would

8—71

have been impossible for him, if he was on the look-out, to see deceased. *Held*, that plaintiff was not entitled to recover.

*Appeal from Jackson Circuit Court.*—Hon. S. H. Woodson, Judge.

Reversed.

*Geo. W. Easley* for appellant.

*Tichenor & Warner* for respondent.

Sherwood, C. J.—Action for damages for injuries resulting in the death of plaintiff's husband. Plaintiff had judgment for $5,000. The yards of defendant, where the accident occurred, are about ten acres in extent, and covered with a net-work of tracks, where the switching of cars and the making up of trains was going on almost continuously during the busy season. It seems to be the customary manner of switching cars in the yard of defendant for the engine to take the cars up toward the bridge then "kick" them off, when they are cut off by yardmen to run on the different tracks wherever wanted; and that cars cannot be coupled at all, without the cars switched have acquired a sufficient momentum to strike the cars to which they are to be coupled, with a considerable degree of force, enough to move the cars with which they come in contact, a distance of several feet. Harris, a car repairer of defendant's cars, was, at the time of the accident, at the south end of a car recently repaired and engaged in inspecting it. That car stood on a track running near the freight depot, and close to the platform of the depot, which track was used by defendant for transferring freight from defendant's road to others. There cars would be placed which had to be unloaded into or loaded from, the cars of other roads. This track was entirely distinct and apart from the repair track. South of, and below the car being inspected, on the same track, and distant nearly a car's length, was a string of fifteen or twenty cars, and

to the north, or in the direction of the bridge, there stood one car, though not, it seems, on the same track.   There was a switch 100 yards north of the car Harris was examining, the track there inclining to the south from the switch.   About 175 feet from the freight depot stood a tool house some ten by twelve feet in size, six or seven feet from the track, where that, after running south from the switch, bore off to the west before reaching the tool house. There was evidence that this house would in all probability obstruct the view of cars coming down the track, but that a man standing on the freight depot platform, could see a car running down the track, if he looked.

While Harris was engaged in the work of inspection, and either under the south end of the car, or else standing on the track at the south end of the car, Hallihan, who was a car repairer of the Mo. R., Ft. S. & G. R. R. Company, had been so for several years, and was thoroughly conversant with the custom of defendant's yards in respect to its method of distributing cars by means of running switches; being accustomed to being about the yards every day, came along on the freight depot platform, and while there or else near Harris, the latter spoke to him to look how certain repairs had been done on the car being inspected. Hallihan, it seems, complied, or attempted to comply with the request made him, when a freight car switched in the usual way, and not coming down very fast, drove the car Harris was examining a distance of seven or eight feet, ran against Harris and over Hallihan, resulting in the death of the latter.   The position Hallihan occupied at the time of the fatal occurrence, it is impossible to determine.   Harris says:   " I had no time to look to see what deceased was doing, the accident was so sudden.   I should judge that, if he had time after I spoke to him, he was stooping down looking at the car when the accident happened.   I don't know whether Hallihan was stooping down on the the track looking at the car.   The accident happened so quick after I spoke to him that I don't know what was

done; it was almost the instant I spoke that the accident happened; there was no time for looking after the words were spoken." This witness also states that he looked immediately after the cars came together, and saw no brakeman on the car or near there; that it was not impossible for a brakeman standing on the car coming down, when within four car lengths, or 128 feet, to see Harris and Hallihan behind the car, though there was " great improbability of it." There was positive testimony of several other witnesses that there was a brakeman on the car which caused the injury.

The foregoing was the substance of the testimony, and upon that we are called on to say whether the court below erred in its refusal to give, at the instance of defendant, an instruction in the nature of a demurrer to the evidence. We think such an instruction should have been given, and these are our reasons therefor: There is nothing in the evidence adduced at the trial to show that defendant was aware of the perilous position in which Hallihan had placed himself, or that, even if thus aware, the injury complained of could have been prevented; for the testimony of Harris conspicuously shows that the negligent act of Hallihan, and the act of defendant causing his death were, to all practical intents and purposes, simultaneous or concurrent acts. Harris calls to Hallihan, the latter responds, or attempts to respond to the call, and immediately the car being examined is struck. So quickly does the one event succeed the other, that Harris will not undertake to say what the position of Hallihan was when receiving the injury. If Harris, in the immediate presence of, and in contiguity to, Hallihan, was not able to discover his position, would it not be altogether unreasonable to demand that a brakeman, if on the incoming car, should be required to do more? And for failing to do this, to demand that the company be held liable?

Liability is never created except by the non-performance of duty, but it was not a failure to perform a duty,

because the defendant failed to anticipate that Hallihan would prove a trespasser on its track. The defendant company had as much right to a free and unobstructed use of that track, and of its yards, and as little cause to suspect or anticipate an interference with those rights, as has the honest farmer for similar unfavorable anticipations, when driving his team afield within his own lawful inclosure, and on the soil of his own homestead. The case is even stronger in behalf of the company in consequence of the peril attendant on and incident to coming in contact with machinery of the dangerous character which the prosecution of its business compels it to employ. A person would, perhaps, be guilty of but slight negligence while attempting to cross, or temporarily to obstruct the roadway of a slow moving farm wagon, while he would be justly held guilty of the extreme of rashness, should he attempt to cross, or to temporarily obstruct the roadway of a moving car.

These remarks, applicable in all instances where a railroad company is engaged in distributing cars, and making up trains in its own private yards, where it owes no special duty to the general public, as in the case of streets, public crossings and the like, apply with unwonted force in the present instance; for not only was Hallihan not engaged in the exercise of a legal right, but he incurred a special risk by venturing upon the transfer track of defendant, and undertaking to examine a car there, when it must be presumed from the facts in evidence, that he was familiar with the peril his rash act invited. That track was devoted to the particular purposes which the evidence discloses, and there was no ground for the presumption that the track in question would be used for any other purpose than those mentioned, or that defendant's servants thus engaged in switching the cars, would anticipate the unaccustomed and unwarranted use to which the track was applied. Now, if it be true, as before stated, that liability can only result from a non-performance of duty, and if it be also true that it was not the duty of de-

fendant to anticipate a failure on the part of Hallihan to observe the most obvious and ordinary dictates of prudence, then of necessity it follows that defendant, failing in the performance of no duty, has incurred no liability. If the defendant's servants with knowledge of Hallihan's dangerous position, or with good grounds to suspect his danger, had willfully or recklessly permitted the car being switched to strike the one being examined, a very different question would be presented. But there is no element of willfulness in this case, and therefore in this respect it is not distinguishable in principle from cases heretofore decided by us, where we held as a matter of law that no cause of action existed. *Maher v. A. & P. R. R. Co.*, 64 Mo. 267 ; *Harlan v. St. Louis, K. C. & N. R. R. Co.*, 64 Mo. 480. For the foregoing reasons the judgment will be reversed. All concur.